IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

GEMINI DRILLING AND FOUNDATION, LLC,

    Plaintiff.

v.

ARCHER WESTERN CONTRACTORS, LTD., *et al.*,

    Defendants.

Civil Action Number 3:05CV772-JRS

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Defendants Archer Western Contractors, Ltd. ("Archer") and Travelers Casualty & Surety Company of America's ("Travelers," and, collectively, "Defendants") Motion to Stay. In their Motion, Defendants request that the Court enter a stay in this action pending resolution of Plaintiff Gemini Drilling and Foundation, L.L.C.'s ("Gemini") claims pursuant to the dispute resolution procedures in Archer's contract with the Virginia Department of Transportation ("VDOT"). For the reasons stated, Defendants' Motion to Stay is hereby DENIED.

**I. BACKGROUND**

Pursuant to a contract entered into with VDOT in August 2004 (the "Prime Contract"), Defendant Archer is the general contractor on the "I-64/CSX Railroad Bridge" construction project underway in Henrico County, Virginia (the "Project"). VDOT is the Project owner. In a Subcontract Agreement entered into in November 2004 (the "Subcontract"), Archer subcontracted with Plaintiff Gemini to provide and install drilled shafts to support the piers of the bridge expansion being constructed by Archer.

The Subcontract provides, in relevant part:

> If Subcontractor is in compliance with this subcontract *and if, and only if, Owner pays Contractor, which is an express condition precedent to Contractor's duty to pay Subcontractor*, Progress Payments shall be due to Subcontractor no later than ten (10) days after receipt of payment from Owner by Contractor provided Subcontractor remains in compliance with the terms of this Agreement. *If the Contractor has provided a payment and performance bond for the project, the Subcontractor shall make no claim on this bond for payment due to the Subcontractor for which the Owner has not paid the Contractor and Contractor's surety is an express third party beneficiary of this promise.*

Subcontract Agreement art. 3.6 (emphasis added). The Subcontract reiterates this condition precedent in the context of changes made or directed by the owner:

> An express condition precedent to payment to Subcontractor on account of changes made or directed by Owner shall be that Contractor shall have received payment from Owner for Subcontractor's changed Work. Each Payment to Subcontractor on account of such change orders shall be equal to Subcontractor's allocable share of Contractor's payment from Owner for the change as determined by Contractor. In no event shall the profit percentage charged by the Subcontractor on a change order exceed the profit awarded to the Contractor by the Owner on the change order.

Id. art. 4.1. The Subcontract also describes a dispute resolution procedure for "owner related disputes:"

> In case of any dispute between Contractor and Subcontractor *in any way relating to or arising from any act or omission of the Owner or Architect/Engineer or involving the Contract Documents*,[1] Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner, by the terms of the Contract Documents, and by any and all preliminary and final decisions, determinations or agreements made by or between Contractor, Architect/Engineer or Owner or so authorized in the Contract Documents or by the court or arbitrator designated in the Contract Documents . . . . *Contractor shall not be liable to Subcontractor in excess of any sum actually received from Owner on behalf of Subcontractor.*
>
> Contractor may, at Contractor's option, (i) present to the Architect/Engineer, the Owner, or any court or arbitrator, in Contractor's name, or (ii) authorize

---

[1] The "Contract Documents" include the Subcontract, the Prime Contract, and all addenda issued thereto and drawings and specifications included therein. See Subcontract Agreement ex. C.

2

> Subcontractor to present to Architect/Engineer, the Owner, or any court or arbitrator in Contractor's name, all of Subcontractor's claims, and to answer the claims of Architect/Engineer or the Owner involving Subcontractor or Subcontractor's Work. If such dispute is prosecuted or defended by Contractor, the Subcontractor, at Subcontractor's own expense, agrees to furnish all documents, statements, witnesses, and other information required by Contractor and to pay or reimburse Contractor for all costs incurred by Contractor in connection with the dispute including, without limitation, attorneys', experts' and consultants' fees.

Id. art. 11.3 (emphasis added). The dispute resolution procedure to which Article 11.3 alludes is outlined in Specification 105.16 of the Prime Contract (incorporated by reference in the Subcontract) and applies when there is an "act of omission or commission by [VDOT] or its agents that allegedly caused damage to [Archer]." See VDOT Road and Bridge Specification 105.16.

In connection with the Subcontract, Archer submitted a "Subletting Request" to VDOT that listed the unit price rates Archer proposed to pay to Gemini for Gemini's drilling services. VDOT approved this Subletting Request on October 14, 2004. Archer also submitted unit price rates to VDOT for the Gemini drilling as part of Archer's bid and Schedule of Items for the Project. In the Subcontract with Gemini, however, Archer agreed to pay Gemini higher unit price rates for the drilling work than the unit price rates listed in both the Subletting Request and the Schedule of Items that Archer submitted to VDOT.

Gemini began work on the Project in December 2004 and, while carrying out the drilling work it had agreed to complete, was paid the comparatively higher unit price rates outlined in the Subcontract. After Gemini made considerable progress in drilling Shafts 1 and 2, however, a VDOT engineer determined that the amount of solid granite in Shaft 1 and 2 was not sufficient for embedding the shaft tips. Accordingly, VDOT directed Gemini to continue drilling. After Gemini drilled to the depth VDOT requested, VDOT then directed Gemini to increase the diameter of the

3

shafts from 42" to 48" for a 21' portion of the shafts. Before complying with this "oversizing" request by VDOT, Gemini sent a letter to Archer purportedly indicating that Gemini would complete the resizing project at the unit price rate specified in the Subcontract. Archer did not reject or counter this letter. Likewise, neither VDOT nor Archer submitted an official change order or change authorization for the additional depth required, or the subsequent oversizing, of Shafts 1 and 2.

Gemini went on to complete the requested oversizing. The parties dispute the extent to which Gemini has been compensated for completing the oversizing. Gemini contends that Archer has refused to pay Gemini for the additional drilling and resizing of Shafts 1 and 2 at the unit rates set forth in the Subcontract, but, rather, has paid Gemini for this work at the unit prices set forth in Archer's bid and Schedule of Values with VDOT. See, e.g., West Aff. ¶ 13. Archer, on the other hand, represents that it has paid Gemini, "as to all pay categories and contract quantities applicable to Gemini, for the same quantities [it] ha[s] been paid by VDOT but Gemini has been paid at the Gemini unit prices." See Will Aff. 1.

Gemini filed its Motion for Judgment alleging breach of contract in the Circuit Court for the County of Henrico and served a copy, along with a summons, on Archer and Travelers in late October 2005. Defendants then removed the case to this Court on November 9, 2005. In their Motion to Stay, Defendants ask that the Court stay these proceedings pending resolution of Gemini's claims in accordance with the provisions of the dispute resolution process outlined in the Prime Contract.

## II. DISCUSSION

In support of their Motion, Defendants rely heavily on the opinion of the United States Court of Appeals for the Fourth Circuit in Seal & Co. v. McGaughan, Inc. 907 F.2d 450 (4th Cir. 1990).

Defendants are correct that the Seal case is particularly instructive—not necessarily for its holding, but, rather, for the analysis employed in determining that the district court should have granted a motion to stay proceedings. In Seal, the Fourth Circuit was faced with the issue of whether the district court should have stayed the proceedings and yielded to the dispute resolution procedure detailed in the prime contract. The court focused on the actual language and meaning of the provisions in the subcontract bearing on the dispute resolution procedure at issue. See id. at 454–55. The subcontract in Seal provided that the dispute resolution procedures outlined in the prime contract should be followed "[i]n case of any dispute between contractor and subcontractor . . . due to any action of Owner or involving the Contract Documents." Id. at 453. The court analyzed the meaning of "contract documents" and found that the dispute centered on the interpretation of language found in one of the incorporated documents. The court, therefore, concluded that the nature of the parties' dispute fell within the intended scope of the dispute resolution provisions and, accordingly, reversed the district court's decision refusing to stay the proceedings. Id. at 455.

Although the holding in Seal is seemingly persuasive, it cannot be blindly applied to the instant facts. Modern jurisprudence interpreting dispute resolution clauses provides a fairly straightforward framework for analyzing the instant Motion. As a general rule, "[w]here a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."[2] AT&T Techs., Inc. v. Commc'ns Workers of

---

[2] The bulk of the relevant dispute resolution case law involves arbitration clauses. As such, this discussion refers mainly to cases in which the enforceability of an arbitration clause was at issue. The Court is convinced that the logic favoring the enforcement of arbitration clauses applies equally to the judicial preference for enforcing other types of dispute resolution

Am., 475 U.S. 643, 650 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960)).  That said, however, "because the legal predicate of compulsory arbitration is contractual consent, courts can require arbitration only of those disputes which the parties have agreed to arbitrate."  Hendrick v. Brown & Root, Inc., 50 F. Supp. 2d 527, 532 (E.D. Va. 1999); see also Gateway Coal Co. v. United Mine Workers of Am., 414 U.S. 368, 374 (1974) (explaining that a party is compelled to submit his grievance to arbitration only if he has contracted to do so").  Importantly, the party seeking a stay "has the burden to prove that the issue which it seeks to arbitrate is referable to arbitration under the contract."  Hendrick, 50 F. Supp. 2d at 532.  "[N]otwithstanding the presumption which favors arbitration," a court must determine the scope and applicability of an arbitration provision using traditional methods of contract interpretation.  Id.; see also Seal & Co. v. McGaughan, Inc.  907 F.2d 450, 454 (4th Cir. 1990) ("The general rule is that parties are free to contract for dispute resolution procedures which, in effect, turn breach of contract claims into claims for relief under the contract.").

Turning now to the facts before the Court, as Article 11.3 ("Owner Related Disputes") of the Subcontract states, and as Defendants emphasize throughout their briefing as the essential basis for their Motion, the parties must proceed according to the dispute resolution procedure described in the Prime Contract should there be a dispute between Archer and Gemini "arising from any act or omission of the Owner or Architect/Engineer or involving the Contract Documents."  Subcontract Agreement art. 11.3.  Here, a factual dispute exists as to whether Archer has paid Gemini for the work Gemini performed on Shafts 1 and 2 at the prices listed in Gemini's Subcontract.  Gemini and Defendants have submitted sworn affidavits adopting contradictory stances on this very issue.  The

---

provisions, as well.

extent to which VDOT has compensated Archer is also not entirely clear. In light of these factual uncertainties, it is evident that Archer, as the party seeking a stay, has failed to meet its burden of proving that the issue which it seeks to have resolved through VDOT's dispute resolution procedure is the type of issue contemplated by the parties to be referable to such an alternative procedure under the Subcontract.

### III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Stay is hereby DENIED.

An appropriate Order shall issue.

ENTERED this  7th  day of March, 2006

/s/
James R. Spencer
CHIEF UNITED STATES DISTRICT JUDGE